UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

EVELYN Y. NIEVES RIVERA,

        Plaintiff,

        v.                             Case No. 09-C-0055

MICHAEL J. ASTRUE,

        Defendants.

---

DECISION AND ORDER
AFFIRMING THE DECISION OF THE COMMISSIONER AND DISMISSING CASE

        Plaintiff, Evelyn Y. Nieves Rivera, seeks review of the final decision of the Commissioner of the Social Security Administration denying her July 6, 2006, application for Social Security Benefits and Disability Insurance Benefits and her July 25, 2006, application for Supplemental Security Income Benefits under Title II and XVI of the Social Security Act. After her applications were denied initially and upon reconsideration, Nieves Rivera testified at a hearing with her attorney and an interpreter present. The Administrative Law Judge issued her decision on October 2, 2008, finding Nieves Rivera not disabled and denying benefits despite multiple severe impairments, including mild degenerative disc disease, depression, anxiety, and osteoarthritis of the right knee, she could perform a restricted range of sedentary work. (R. 6, 14, 16, 18.) On November 10, 2008, the Appeals Council denied Nieves Rivera's request for review (R. 1), and the ALJ's decision was the final decision of the Commissioner. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). Because the ALJ has built an accurate and logical bridge between the

evidence and the results and the findings of fact are supported by substantial evidence, the decision of the Commissioner will be affirmed.

BACKGROUND

Nieves Rivera, who was thirty-three years old at the time of the ALJ's decision, earned a social work degree in Puerto Rico. (R. 34-35.) She has worked as a teacher's aide and a social worker and has been employed in community crime prevention for a police department. (R. 35-36.) Nieves Rivera does not speak English. (R. 110.)

In 2000, Nieves Rivera hyperextended her neck after firing a gun while working for the police department and began experiencing back pain. (R. 196.) The constant pain is located in her lumbar spine and does not radiate into her legs. (*Id.*) Her pain is worse when walking and standing, than it is when sitting. (*Id.*)

An October 7, 2005, x-ray on Nieves Rivera's left shoulder was "[u]nremarkable." (R. 163.) In April of 2006, Nieves Rivera's lower-back x-ray showed minor scoliosis, but no fractures or dislocations. (R. 169.) Nieves Rivera's examination indicated "moderate tenderness at left lumbar portion with significant limitation of ROM [Range of Motion] walking and sitting." (R. 183.) In June of 2006, Nieves Rivera received a lower-back MRI that showed degenerative disc disease with small-to-moderate-sized disc protrusion. (R. 166-67.) Also in June, 2006, Nieves Rivera received a right knee x-ray that showed no fracture or dislocation. (R. 155.) However, the x-ray did disclose joint space narrowing and hypertrophic arthritic changes consistent with osteoarthritis, soft tissue density consistent with suprapatellar joint effusion, and subchondral cyst formation beneath the tibial spine. (*Id.*) Progress notes from Clinica Latina on June 23, 2006, state "patient

has significant limitation of ROM . . . lower ext-arc weakness in [Left Upper extremity]." (R. 179.)

In July, 2006, treating physician Shirley Blancas, M.D., completed a "Capacity Form for W2 Activities" and opined that Nieves Rivera could not perform any work or lift more than two pounds. (R. 171-73.) Radiologist Apichai Jarenwattananon, M.D., noted that the "MRI study demonstrates moderate degree of alteration of intensity of L5-S1 disc with a focal small to moderate-sized broad-based central posterior L5-S1 disc protrusion, effacing the corresponding anterior surface of the dural sac but without apparent compromise of the corresponding nerve roots within the spinal canal or neural foramina of the lumbar spine at this level." (R. 166.)

In October, 2006, state agency physician Zhen Lu, M.D., concluded that Nieves Rivera could occasionally lift and/or carry and push and/or pull up to ten pounds, could stand and/or walk at least two hours in an eight-hour workday, could sit about six hours in an eight-hour workday, could frequently climb, balance, kneel, and crawl, and occasionally stoop and crouch. (R. 206-213.) State agency physician Pat Chan, M.D., similarly concluded in November, 2006, that Nieves Rivera could lift and/or carry and push and/or pull up to ten pounds, occasionally stand and/or walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (R. 226-33.)

During a consultive exam in September, 2006, with John Reineck, M.D., Nieves Rivera demonstrated normal heel-to-toe walking, but was hesitant to walk without a cane, fearing that her legs would give way. (R. 197.) She had full range of motion in her cervical spine. (*Id.*) While Nieves Rivera had no appreciable muscular spasm in her lumbar and thoracic spines, there was tenderness. (*Id.*) In addition, she had a negative

3

straight leg test and full motion in her upper and lower extremities. (R. 197-98.) Dr. Reineck thought that Nieves Rivera could benefit from generalized physical therapy and abdominal muscle strengthening and recommended that Nieves Rivera continue taking nonsteriodal anti-inflammatory drugs. After a physical examination with Kenneth Chiou, M.D., in September of 2006, Dr. Chiou noted that "[d]eep palpation of the lumbar region reveal[s] a trigger point tenderness along the lumbar paravertebral muscle region." (R. 204.) Dr. Chiou's impression was that "[h]istory and physical examination seem to suggest lumbar disk disease . . . ." (*Id.*) A note from Maritza Laguna, M.D., in September, 2006, stated that Nieves Rivera's "[c]ervical spine showed abnormalities limitation of all range of motion." (R. 302.) Also, Dr. Laguna observed that Nieves Rivera's gate and stance were "abnormal [and that she] walks with the aid of a cane." (*Id.*)

In November and early December, 2006, Nieves Rivera attended five counseling sessions. (R. 238.) Her global assessment of functioning (GAF)[1] at intake and discharge were rated at fifty-five.

In March of 2007, Dr. S. Razzag had Nieves Rivera repeat an MRI because it appeared Nieves Rivera's symptoms had worsened in the last couple months. The MRI showed desiccation and disc thinning in the lower back, along with a small disc bulge, but no herniation. (R. 263.)

---

[1]The GAF score reflects a clinician's judgment of an individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000) [hereinafter DSM IV-TR]. GAF scores from forty-one to fifty indicate serious symptoms or impairments, including suicidal ideation, no friends, or an inability to hold a job. GAF scores from fifty-one to sixty indicate moderate symptoms or limitations, and scores from sixty-one to seventy indicate some mild symptoms or limitations. *Id.* GAF scores from seventy-one to eighty indicate transient symptoms and no more than slight impairment in social and occupational functioning, while GAF scores from eighty-one to ninety indicate absent or minimal symptoms, with good functioning in all areas.

From January, 2008, through March, 2008, an Aurora psychiatric physician saw Nieves Rivera once per month for counseling and diagnosed her with moderate depression. (R. 322-35.) In February, 2008, Nieves Rivera admitted herself for in-patient psychiatric care, reporting depression and suicidal ideations. (R. 269.) Her GAF at intake was rated 35, and four days later upon discharge, was rated at 60. (*Id*.) From March of 2008, through September of 2008, Nieves Rivera attended individual counseling sessions on an approximate weekly basis. (R. 359-85.)

In July, 2008, Nieves Rivera was examined by orthopedist Raj Rao, M.D., and underwent a lower back MRI that revealed mild degenerative changes, with no evidence of significant stenosis or large disc herniation. (R. 352-57.) Dr. Rao recommended against surgical intervention, and asked Nieves Rivera to continue self-supervised physical therapy stretches and to "use occasional over-the-counter medications for any flare-ups in pain." (R. 358.)

Nieves Rivera explained that she had "lots of pain" in her back, hips, legs, neck, and head. (R. 36.) She further reported that none of the back treatments including physical therapy and electric shock therapy had helped. (R. 36-37.) According to Nieves Rivera, her neck pain "comes and goes," occurring approximately two to three times per week. (R. 37.)

Nieves Rivera also took medication for anxiety and depression and was seeing a counselor weekly. (R. 37-38.) The medication and therapy were not helping "much." (R. 38.) At times, she would not want to speak to anyone, would argue with her children, and "become a little aggressive." (R. 38.) Nieves Rivera experienced panic

attacks  weekly, and would start shaking, her chest would burn, and she would feel dizzy.
(R. 41.)

Nieves Rivera stated that she can stand for no more than thirty minutes at
a time, walk about two blocks, sit no more than forty-five to sixty minutes at a time, and lift
no more than a gallon of milk.  (R. 38.)

Nieves Rivera explained that she cares for her three children, but is unable
to cook much, and relies on her children to do the household chores.  (R. 39.) She testified
that she drives for short distances and that her medications make her sleepy and dizzy.
(*Id.*)  In 2006, Nieves Rivera began using a cane to prevent her from falling and she has
not fallen since.  (R. 41, 44.)

The ALJ asked the vocational expert to discuss the jobs that were available
for a person of Nieves Rivera's age and vocational background, who was limited to
unskilled, sedentary jobs that could be learned only through demonstration.  (R. 45-46.)
The VE explained that there were approximately 2,000 sedentary assembly, 1,500
production, and 1,500 packing/hand packaging jobs in Wisconsin.  (R. 46.)  Morever, the
VE  confirmed that her testimony was consistent with the Dictionary of Occupational Titles
("DOT").  (R. 47.)  The VE further testified that usually the employers she was describing
tolerate one or two absences per month, as long as the employer does not anticipate that
such absences will be a regular monthly event.  (*Id.*)

On many occasions, Nieves Rivera indicated that she found daily tasks
difficult to perform.  On her Social Security Functional Report, August, 2006, she stated
"dress[ing] is hard [be]cause I have to lift my arm to put on the dress and it hurts to[o]
much," and "bath[ing] is uncomfortable because I have to bend down."  (R. 124.)  She also

6

indicated that her children must assist her brushing her hair and shaving her legs and underarms. (*Id.*) Additionally, at the August 12, 2008, hearing, Nieves Rivera testified that she depends on her children to "wash dishes, to sweep, to mop, to vacuum, [and] to wash the clothing . . . ." (R. 42.)

## STANDARD OF REVIEW

This court's review of the Commissioner's decision is limited and in the absence of an error of law, will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reconsider the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *William v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Chromic v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). If reasonable minds can disagree on whether an individual is disabled, the court must affirm the Commissioner's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). However, the district court is required to review the evidence critically and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

## ANALYSIS

Nieves Rivera maintains that the ALJ's credibility determination does not comply with SSR 96-7p and is not supported by substantial evidence. She points to certain

flaws in the ALJ's opinion that affected the credibility determination: (1) the ALJ improperly analyzed Nieves Rivera's testimony that she depends on her children to "wash dishes, sweep, mop, vacuum, [and] wash the clothing . . . . and that her children "shave [her] legs, they wash [her] hair;" (Pl.'s Rep. Br. at 2) and (2) the ALJ failed to apply the applicable legal standards in evaluating Dr. Blancas' testimony. (*Id.* at 3.)

In considering a claimant's symptoms, SSR 96-7p requires that an ALJ follow a two-step process in which it must first be ascertained "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (SSR 96-7p.) Once an underlying physical or mental impairment has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. (*Id.*) The ALJ makes a determination regarding the credibility of the objective medical evidence by considering the entire case record. Because the ALJ has the best opportunity to judge a witness' truthfulness, the ALJ's credibility determination stands unless patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

In this instance, the ALJ considered the record including testimony that Nieves Rivera experienced "extreme limitations due to pain throughout her whole body. She also complained of social isolation and aggression." (R. 16.) The ALJ also stated that under the first step of the two-step process, "the claimant's medically determinable impairments could reasonably be expected to produced the alleged symptoms[.]" (*Id.* 17.) However, the ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are

8

inconsistent with the residual functional capacity assessment . . . ." (*Id.*) Furthermore, the ALJ explained that the medical evidence did not "support the claimant's complaints of severe, debilitating pain." (*Id.*) Specifically, the ALJ pointed out that during her examinations "doctors have questioned her efforts." (*Id.*) She noted that Nieves Rivera only takes over-the-counter medications and participates in physical therapy for pain. (*Id.*)

While a cursory review will not support an ALJ's finding that the claimant was not credible, here the ALJ's analysis was more than conclusory. SSR 96-7p requires the ALJ to give reasons based on all of the evidence in the record. In this case, the ALJ weighed Nieves Rivera's claims against the medical evidence, and thus complied with SSR 96-7p. Just because an ALJ's reasoning could have been more elaborate does not mean that it was fundamentally defective. The ALJ was in the best position to observe Nieves Rivera, and, therefore, the ALJ's credibility determination is entitled to considerable deference. *Skarbek v. Barnhart*, 390 F.3d 500, 504, (7th Cir. 2004).

In assessing the credibility of the claimant's statements, 20 C.F.R. §§ 404.1529(c) and 416.929(c) list seven factors that the ALJ must consider in addition to the objective medical evidence. These seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain

or other symptoms.  SSR 96-7 and 20 C.F.R. § 404.1529 do "not require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure that she considered the important evidence and to enable the court to trace the path of her reasoning." *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1055 (E.D. Wis. 2005).

In analyzing Nieves Rivera's testimony, the ALJ considered the testimony in light of the whole record.  The ALJ stated that:

> [t]he claimant presented herself at the hearing as someone with extreme limitations due to pain throughout her whole body.  She also complained of social isolation and aggression.
>
> The medical records contain very little objective evidence to support the claimant's complaints of severe, debilitating pain.  MRIs in 2008, 2007 and 2006 are all essentially consistent (Exhibits 22F, 15F, and 2F).  They indicate the claimant has a relatively mild bulging disc at the L5-S1 level of her spine.  There is no nerve root involvement or canal stenosis (Exhibit 22F).  There is no evidence of neurological symptoms that would warrant surgery (Exhibits 22F and 15F).  Examinations show no evidence of atrophy, muscle weakness, or other wasting (Exhibits 22F and 15F). The claimant also underwent electrodiagnostic and nerve conduction studies which indicated no abnormalities (Exhibit 21F and 15F).  Specifically, there was no diagnostic evidence of radiculopathy (Exhibit 15F).
>
> The claimant was seen in consultation by Dr. Rao at the Medical College of Wisconsin in July and August 2008; Dr. Rao indicated that the claimant was not a surgical candidate because she had "no significant pathology" (Exhibit 22F).  He suggested continued physical therapy and the use of over the counter pain medications (Exhibit 22F).  Dr. Rao essentially confirms the lack of objective evidence.
>
> The undersigned does not find the claimant to be a particularly credible witness regarding her pain symptoms.  The claimant presents herself as very limited, but doctors have questioned her efforts when being examined.  She put forth only variable effort when being examined by Dr. Rao (Exhibit 22F).  And, during her consultative examination she had significant 'breakaway' pain (Exhibit 5F).  As noted above, there

is a significant lack of objective evidence to support the claimant's level of pain.

The medical evidence also indicates the claimant has been treated for depression and anxiety since about November 2006 (Exhibit 12F), though her condition did not become acute until she was hospitalized from February 5-9, 2008 (Exhibit 16F). Follow-up examinations and counseling indicated [that] the claimant was doing better after taking her medications[,] which gave her no side effects (Exhibit 19F). An examination just before her hospitalization showed [that] the claimant had good concentration, insight[,] and judgment with an intact memory (Exhibit 19F). Treatment notes from July 2008 demonstrate [that] the claimant's mood and affect were only slightly flat (Exhibit 22F), with normal mood and affect shown later at a pain clinic (Exhibit 21F). As previously discussed, the claimant was released from the hospital with a GAF of 60 (Exhibit 16F).

The state agency medical consultants both opined that the claimant could perform the exertional requirements of sedentary work (Exhibits 10F and 7F). Considering the paucity of objective evidence, these assessments appear to give considerable benefit of the doubt to the claimant's subjective complaints. . . .

(R. 16-17.)

The ALJ was correct to analyze this evidence because "treating physicians' opinions regarding the nature and severity of a claimant's symptoms normally are given controlling weight when well-supported by medically acceptable clinical and diagnostic techniques." *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). While the ALJ could have specifically addressed Nieves Rivera's limitations in more detail, she referenced the testimony sufficiently and compared it to the other evidence in the record, noting that Nieves Rivera's claimed level of pain was not consistent with the objective evidence.

"When treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision."

*Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). Accordingly, the ALJ considered

Dr. Blancas' testimony in light of all of the other evidence available. The ALJ stated:

> [t]he only other opinion evidence is that by a doctor on a form provided to the claimant to allow her not to have to work under the state's W-2 program (Exhibit 3F). The opinion indicates [that] the claimant cannot work more than 2 hours per day or lift more than 2 pounds.
>
> The state agency opinions are well supported by the great weight of the medical evidence and give considerable credence to the claimant's subjective allegations. Therefore, the undersigned gives these opinions significant weight. The medical opinion from Exhibit 3F does not appear to have any objective backing or indication how the doctor reached his/her conclusion other than by simply accepting the claimant's subjective complaints. The undersigned therefore gives [Dr. Blancas'] opinion little weight.
>
> (R. 17-18.)

In *Dixon*, the court stated that the ALJ "may properly reject a doctor's opinion

if it appears to be based on a claimant's exaggerated[,] subjective allegations." 270 F.3d

at 1178. The ALJ analyzed Dr. Blancas' opinion and determined that the doctor did not

explain her conclusions based on the evidence presented. The MRI that Dr. Blancas

ordered merely confirmed the presence of degenerative disc disease and osteoarthritis.

Furthermore, in her Capacity Form for W2 Activities, Dr. Blancas never referenced prior

tests or explained her conclusions about Nieves Rivera's physical capacities. Because of

the subjective nature of Dr. Blancas' examination, this court cannot say that the ALJ was

incorrect in determining that Dr. Blancas' testimony was not supported by the great weight

of the evidence.

In a case such as this where the ALJ has built an accurate and logical bridge

between the evidence and the results and the findings of fact are supported by substantial

evidence, this court will not substitute its own judgment for that of the Commissioner. Now, therefore,

IT IS ORDERED that this case is affirmed.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE